William H. Sloane (WS: 1301)
Joseph Asaro (JA: 9654)
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for Plaintiff NutraCea*



**JUDGE HAIGHT**

RECEIVED
OCT 0 6 2006
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

06 CV 8201

----------------------------------------------------------- x
NUTRACEA,                                      :  Case No.
                                               :
                        Plaintiff,             :    **COMPLAINT**
                                               :
            - against -                        :    (JURY TRIAL DEMANDED)
                                               :
LANGLEY PARK INVESTMENTS PLC,                  :
HARRY G. PEARL, RUFUS PEARL, PEARL             :
INVESTMENT MANAGEMENT SERVICES                 :
LIMITED, GOTTBETTER & PARTNERS,                :
LLP, and DOES 1 through 50 inclusive, ,        :
                                               :
                        Defendants.            :
----------------------------------------------------------- x

Plaintiff NutraCea alleges as follows:

## PARTIES

1.      NutraCea (hereafter "NutraCea") is a California corporation with its principal place of business in El Dorado Hills, California.

2.      Defendant Langley Park Investments PLC (hereafter "Langley") is a corporation organized under the laws of England and Wales with its principal offices in London, England.

3.      Defendant Harry G. Pearl is an individual residing in the United Kingdom.

4.      Defendant Rufus Pearl is an individual residing in the United Kingdom.

5.      NutraCea alleges on information and belief that Defendant Pearl Investment Management Services Limited (sometimes referred to herein as "PIMS") is a company operating out of the United Kingdom.  NutraCea alleges on information and belief that PIMS is owned and operated by defendants Harry Pearl and Rufus Pearl.

6116646.1

6.      On information and belief NutraCea alleges that defendant Gottbetter & Partners, LLP (hereafter "Gottbetter") is a limited liability partnership operating in New York, New York.

7.      NutraCea is unaware of the true names and capacities of the defendants sued herein as Does 1 through 50.  NutraCea alleges that these fictitiously named defendants are responsible for the actions complained of herein and/or are the agents or representatives of the other defendants.  NutraCea will amend this complaint to allege the true names of the fictitiously named defendants when the identities of those defendants are determined.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §78 and 28 U.S.C. §1331 as the complaint states claims for relief governed by federal law.  This Court also has jurisdiction over this action as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over the state law claims asserted herein.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d) because defendant Gottbetter resides in this district and the remaining defendants are not residents of the United States.  In addition, the contract at issue in this case contains a forum selection clause in which the parties submit to the jurisdiction of the state and federal courts situated in the County and State of New York.

## BACKGROUND FACTS

10.     In early August of 2004, Langley representatives, including Rufus Pearl, Harry Pearl and Alastair Rae, commenced discussions with NutraCea, through its representative Brad Edson, about selling Langley shares to NutraCea pursuant to a Private Placement transaction.  Langley was set up to look and act like a mutual fund.  Langley sold Langley stock to various target companies.  As consideration for the sale of the Langley stock, Langley took back shares of the target companies.  NutraCea was one such target company.

6116646.1

11.    As part of the initial solicitation of the transaction, Langley provided NutraCea with a Confidential Private Offering Memorandum dated June 17, 2004 (the "Private Placement Memorandum" or "PPM") which described the terms of the offering in detail.    The representations contained in the Private Placement Memorandum were expressly authorized by Langley.

12.    In the PPM Langley described the proposed transaction as "an innovative method of raising financing" for smaller cap companies.  The express purpose of the transactions with the target companies was to allow the target companies, such as NutraCea, to "raise capital immediately without under or over pricing their equity."  Thus, Langley was selling Langley shares to the target companies which were to be immediately tradeable by the target companies on the open market at a value substantially equivalent to the value of the target companies' shares used to purchase the Langley shares.  The shares of target company stock were generally restricted and could not be immediately traded on the open market.

13.    The PPM provided that due diligence for Langley investments would be conducted by Stellington Services Limited.  Plaintiff is informed and believes that Stellington Services Limited is owned by the father of defendants Rufus and Harry Pearl.  Defendant Pearl Investment Management Services Limited was identified in the PPM as the Financial and Investment Advisor for the Langley investments.  Langley's Directors had the discretion to determine in which companies Langley would ultimately invest.  At the time of the offering those directors were Harry Pearl, Rufus Pearl and Robin Bolton.

14.    Target companies, including NutraCea, were induced to invest in Langley by representations as to the experience and accolades of Rufus and Harry Pearl and of their company PIMS.  Specifically, through the PPM Langley represented that "The Directors, Stellington and PIMS all have considerable experience of investing in and obtaining funding for companies in the Smaller Cap sector."  With respect to Harry Pearl, Langley stated: "Harry Pearl is a director of Pearl Investment Services Limited... .  He was previously a vice president at Citadel Investment Group Limited whose 'Kensington Global Strategies Fund' won top honours

6116646.1

at the Alternative Investment Awards for scoring the highest risk-adjusted returns making Citadel arguably 'the best hedge fund in the world'... ."  With respect to Rufus Pearl, Langley stated: "Rufus Pearl is the Managing Director of Pearl Corporate Finance Limited, ... . He is an assistant investment director of Jubilee Investment Trust plc and of Trustee of The Land and Equity Pension Fund."

15.    Langley also represented in the PPM that, in selecting investments, Langley would "look for Target Companies with a proven management team" and would invest in target companies "set to show an increase in the price of their traded securities over the ensuring months and years."

16.    In the "Investment Criteria" section of the PPM, Langley set forth the criteria it would utilize to select investments.  In the "Optional Criteria" section Langley stated that its analyst, Stellington, would analyze each target company to ensure that none of the following conditions existed:

a)    The most recent audited accounts of the Target Companies should not contain any material qualification;
b)    Investments should not be made in any Target Companies which have issued a profit warning or made other adverse announcements relating to their businesses;
c)    Investments should not be made in any Target Companies which are under investigation by an official body;
d)    Investments should not be made in any Target Companies which would require a disproportionate amount of time on the part of Langley in terms of on-going monitoring of the investment;
e)    The Target Company should not be engaged in any material litigation, regulatory dispute or compensation issue.

17.    That section of the PPM provides that the Directors could still approve an investment which does not meet one or more of these criteria if, "on balance, they consider the investment to be beneficial to the Company in all circumstances."

18.    Langley, and its controlling officers and advisors, Rufus and Harry Pearl and PIMS, did not follow these criteria.  Plaintiff is informed and believes that Langley, Rufus Pearl and Harry Pearl never intended to follow these criteria.  The majority of the companies in which Langley invested failed to meet the criteria set forth and there was no good faith basis for

approving the investments and waiving the criteria.

19.    By the terms of the PPM, Langley offered to sell Langley shares of stock valued at £1 (UK) each for an equivalent value of NutraCea restricted stock. Following delivery of the PPM to NutraCea, Langley representatives, including Rufus Peal, Harry Pearl and Alastair Rae, had repeated conversations with representatives of NutraCea, including Brad Edson, about the transaction. On August 10, 2004, Brad Edson emailed Rufus Pearl and informed him that NutraCea was looking to generate at least $1 million in immediate funding through the transaction with Langley. In subsequent telephone discussions between Harry Pearl and Brad Edson, Mr. Pearl represented that NutraCea would be able to immediately generate at least $1 million in capital through selling the half of the Langley shares NutraCea would receive for at or around £1 per share.

20.    In subsequent emails and telephone conversations with Alastair Rae, Harry Pearl and Rufus Pearl, Mr. Edson reiterated that NutraCea needed to generate at least $1 million in immediate funding through the transaction. The proposed transaction was to be structured in a manner whereby NutraCea could sell half of the total Langley shares it received. The other half would be held in escrow for two years to provide Langley with downside price protection. Langley, through Rufus Pearl, Harry Pearl and Alastair Rae, expressly stated that they understood NutraCea needed to immediately generate at least $1 million and they represented and agreed that NutraCea would be able to generate at least that amount through the immediate sale of half of the Langley shares it was to receive under any transaction. Mr. Edson had many conversations with Messrs. Pearl, Pearl and Rae in which they discussed how many Langley shares NutraCea would need to acquire in order to generate $1 million in funding based on a £1 per share initial offering of Langley. During the conversations with Mr. Edson, Alastair Rae, Rufus Pearl and Harry Pearl each confirmed that the Langley stock NutraCea was to receive immediately upon closing (which amounted to half of the total stock purchased) would be initially priced on the market and tradeable at or near £1 per share and that NutraCea could expect to generate over $1 million immediately after the transaction closed by selling the

Langley stock.

21.     Based upon this understanding Mr. Edson and Messrs. Pearl, Pearl and Rae agreed that NutraCea would sell Langley 7 million NutraCea shares in exchange for an equivalent value of Langley shares.  Messrs. Pearl, Pearl and Rae represented that the Langley shares NutraCea was to receive in return were valued at £1 per share.  NutraCea's shares were worth $.34 on the open market.  The parties agreed to apply the then applicable exchange ratio of dollars to pounds to determine the number of Langley shares received at a value of £1 each.  After applying the currency exchange rate NutraCea was to receive 1,272,026 Langley shares.  Messrs. Pearl, Pearl and Rae represented to Mr. Edson that the Langley stock would be listed on the London stock exchange at £1 per share and that half of the Langley shares would be immediately saleable at or near that price and that NutraCea could thus generate approximately $1.19 million in capital immediately after the closing of the transaction.

22.     As the Langley stock was to be immediately tradeable, the PPM provided that the transaction would be rescinded and unwound if Langley failed to list its stock on the London Stock Exchange by September 30, 2004.

23.     In reliance on the representations of Langley, as contained in the PPM, and as expressed by Rufus Pearl, Harry Pearl and Alastair Rae, NutraCea and Langley entered into a written Stock Purchase Agreement on or about September 1, 2004.  At the same time, NutraCea, Langley and Langley's New York attorneys Gottbetter & Partners LLP entered into a written Escrow Agreement which was expressly referenced in the Stock Purchase Agreement as one of the "Transaction Documents."

24.     Under the terms of these agreements, Langley agreed to sell to NutraCea 1,272,026 shares of Langley stock valued at £1 each for an equivalent value of NutraCea stock.  As NutraCea's stock was selling on the open market at $.34 per share, NutraCea agreed to transfer 7 million shares of NutraCea restricted stock to Langley, which, pursuant to the exchange rate at the time was an equivalent value to the Langley shares at £1 per share.  Under the Stock Purchase Agreement, Langley was precluded from selling the NutraCea shares for a

period of two years after Closing.

25.   Under the terms of the Stock Purchase Agreement and the Escrow Agreement, NutraCea agreed to deposit the 7 million shares of restricted NutraCea stock with the designated Escrow Agent, Gottbetter.   Likewise, Langley was required to deposit the 1,272,026 Langley shares with the Escrow Agent.  Langley was then required to list its stock with the London Stock Exchange by September 30, 2004.  If Langley listed its stock by that date then the Escrow Agent was directed to distribute the 7 million NutraCea shares to Langley and to distribute half of the 1,272,026 shares to NutraCea.  The other half of the Langley shares would remain deposited with the Escrow Agent for two years pursuant to the price protection provisions of the agreements.  If Langley failed to list its stock with the London Stock Exchange by September 30, 2004, and to notify Gottbetter of the listing by September 30, 2004, then Gottbetter was required to return the 7 million shares of NutraCea stock to NutraCea and to return the 1,272,026 Langley shares to Langley, thus unwinding the transaction, unless NutraCea waived Langley's failure to timely list its shares in writing.

26.   NutraCea timely performed all of its obligations under the agreements by, among other things, depositing 7 million NutraCea shares with the Escrow Agent.

27.   Langley did not list its stock with the London Stock Exchange by September 30, 2004 as required in the agreements.  To the contrary, the stock was not listed on the London Stock Exchange until October 7, 2004.  NutraCea did not waive the requirement that stock be timely listed on the stock exchange as required by the agreements.  Therefore, pursuant to section 2(b) of the Escrow Agreement, and as set forth in the PPM, the Escrow Agent was required to cause a rescission of the transaction and return the NutraCea shares to NutraCea and return the Langley shares to Langley.  In violation of the agreements, the Escrow Agent delivered the NutraCea shares to Langley and half of the Langley shares to NutraCea.

28.   Contrary to the oral and written representations of Langley, Langley's stock was never worth £1 as promised.  Rather, Langley initially listed the stock on the London Stock Exchange for £.30, 70% lower than the £1 Langley represented.  From October 7, 2004 (the first

-7-

6116646.1

listing day) to today, the highest listing value for Langley was £.30. As of the filing of this complaint the stock is valued at £.12, almost 90% lower than the £1 value represented by Langley.

29.     The express purpose of the transaction was to trade stock of equivalent value as of the exchange date. Langley knew and understood that NutraCea intended to raise capitol by immediately selling the Langley stock which would raise capital in an amount equal to the value of the NutraCea stock parted with. That purpose was defeated and frustrated as a result of the misrepresentations of Langley. Therefore, NutraCea did not sell the Langley shares it received as it had initially planned to do.

30.     Furthermore, after the transaction was consummated, NutraCea learned that Langley did not follow the investment criteria set forth in the PPM. Langley invested in companies which were insolvent, which never had revenues, which did not have proven management teams, which had no prospects for showing an increased value and which were under investigation by the SEC. NutraCea is informed and believes that little or no due diligence was conducted by Langley, Rufus or Harry Pearl, PIMS, or Stellington.

31.     NutraCea alleges on information and belief that the misrepresentations of Langley and of Rufus and Harry Pearl were intentional and done with intent to deceive NutraCea. Alternatively, NutraCea alleges on information and belief that the misrepresentations were made with reckless disregard for the truth. The conduct of Langley, and of its principals and controlling agents Rufus Pearl and Harry Pearl, was committed with oppression, fraud and/or malice thus entitling NutraCea to an award of punitive damages.

## FIRST CLAIM FOR RELIEF

(Securities Fraud (78 U.S.C. §78j) – Against Langley, Rufus Pearl and Harry Pearl)

32.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

33.     The Langley shares sold to NutraCea constitute "securities" as defined in Section 3(a)(10) of the Securities Exchange Act of 1934.

34.    Through means of interstate commerce, including use of the mail, facsimile and/or email, Langley, Rufus Pearl and Harry Pearl engaged in manipulative and deceptive practices in connection with the sale to NutraCea of the Langley stock in violation of the Securities Exchange Act of 1934, section 10b-5 thereto.

35.    Specifically, Langley through it agents including Rufus Pearl, Harry Pearl, and Alistair Rae, made false material representations to NutraCea including the following:

a.    Langley and its agents were conducting due diligence of the target companies to ensure that the target companies had proven management and that it would be investing in companies set to show an increase in price of their traded securities.

b.    Langley would not invest in companies with profit warnings.

c.    Langley would not invest in companies which were under investigation by an official body.

d.    Langley's stock was valued at £1 per share and that the stock could be immediately sold at or near £1 per share when the transaction closed.  It was expressly understood that the Langley shares were equivalent in value to the NutraCea shares exchanged as consideration for the Langley shares under the agreements and that NutraCea could immediately sell half of the Langley shares at or near the £1 per share price to immediately raise capital.

e.    Langley's stock would be listed on the London Stock Exchange by September 30, 2004 and if it was not listed by that date then the transaction would be unwound.

36.    Each of these representations was false.  NutraCea is informed and believes that Langley invested in companies which had never generated revenues, companies which were under investigation by the SEC for securities fraud and companies which were insolvent and/or generated little or no revenue.  The quality of the investments reveal that little or no due diligence was conducted and that the investment criteria set forth in the PPM were not followed. More fundamentally, Langley's stock was never worth or valued at anything near £1 per share. Langley was not listed on the London Stock Exchange until October 7, 2004, seven days after the September 30, 2004 deadline.  Despite this fact, Langley did not unwind the transaction and

return the consideration paid by NutraCea. When Langley stock was finally listed on the London Stock Exchange, it was listed at 30 pence per share, not the £1 represented.

37.     Langley, Harry Pearl and Rufus Pearl made these misrepresentations with the intent to defraud NutraCea and/or recklessly without regard to the truth.

38.     NutraCea was ignorant of the truth and reasonably relied upon the representations of Harry Pearl and Rufus Pearl, and of Langley's other agent Alastair Rae by agreeing to enter into the subject transaction.   NutraCea would not have invested had it known that these representations were untrue.

39.     Based upon the misrepresentations alleged above NutraCea has been damaged in an amount to be proven at trial which amount includes the difference between the value of the Langley stock as promised in 2004 and the value at the time of trial.

40.     Alternatively, NutraCea seeks the remedy of rescission of the underlying agreement and hereby offers to deposit with the Court or an appropriate escrow officer the Langley shares it received.

41.     Rufus Pearl and Harry Pearl were active participants in the fraud committed upon NutraCea.  Rufus Pearl and Harry Pearl used their names and reputations as part of the active solicitation of this transaction to NutraCea.  Additionally, Rufus Pearl and Harry Pearl either directly or indirectly made or authorized all of the representations made to NutraCea.  Rufus Pearl and Harry Pearl also had full control powers over Langley.  They were the two senior members of Langley's Board of Directors and were responsible for final decisions on all investments by Langley and they were in charge of the day to day operations of Langley.  They were also directly responsible for all representations made to NutraCea including those made in the PPM.  Thus, Rufus Pearl and Harry Pearl are directly responsible for the fraud committed upon NutraCea.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

6116646.1

## SECOND CLAIM FOR RELIEF

(California Securities Fraud – Against Langley, Rufus Pearl and Harry Pearl)

42.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

43.     Langley sold securities to NutraCea, a California resident, and is therefore subject to the laws of the state of California, including California's securities laws.  Likewise, as alleged in paragraphs 10-22, 35 and 41 above, Harry Pearl and Rufus Pearl actively participated in the sale of securities to NutraCea and made the representations to a California resident upon which Langley relied.

44.     Langley, Harry Pearl and Rufus Pearl made the misrepresentations set forth in paragraphs 10-22 and 35 above in connection with the sale of its securities to NutraCea.

45.     As set forth in paragraphs 27 - 30 and 36 above, the representations made by Langley were untrue.  Alternatively, Langley failed to state material facts necessary to make the statements not misleading.

46.     The representations made were material to NutraCea's decision to invest in Langley and NutraCea would not have invested had it known the representations were untrue.

47.     As such, Langley committed securities fraud under California Corporations Code section 25401.

48.     Harry Pearl and Rufus Pearl are also liable to NutraCea pursuant to California Corporations Code section 25403 as they actively participated in the fraud, controlled Langley, and/or substantially assisted or aided Langley's fraud.

49.     As a result of the conduct of the defendants, NutraCea has been damaged in that it has received shares worth substantially less than promised.  NutraCea therefore seeks an award of damages in an amount to be proven at trial.  Alternatively, NutraCea seeks rescission of the transaction.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

6116646.1

## THIRD CLAIM FOR RELIEF

### (Fraud – Against Langley, Rufus Pearl and Harry Pearl)

50.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

51.     Langley, through its representatives including Rufus Pearl, Harry Pearl and Alastair Rae, made material misrepresentations to NutraCea with the intent to defraud NutraCea. The misrepresentations made are set forth in detail in paragraphs 10-22 and 35.

52.     These representations were false as discussed in paragraphs 27-30 and 36 above.

53.     These misrepresentations were made with intent to defraud NutraCea and/or recklessly without regard to the truth.

54.     NutraCea reasonably relied upon these representations by agreeing to enter into the subject transaction.  NutraCea was ignorant of the true facts.

55.     As a result of NutraCea's reliance on these misrepresentations, NutraCea has been damaged in an amount to be proven at trial which amount includes the difference between the value of the Langley stock as promised in 2004 and that which was provided, plus pre-judgment interest.

56.     In the alternative to damages, NutraCea seeks the remedy of rescission of the underlying agreement and hereby offers to deposit with the Court or an appropriate escrow officer the Langley shares it received.

WHEREFORE, NutraCea prays for judgments as hereafter set forth.

## FOURTH CLAIM FOR RELIEF

### (Violation of Investment Advisors Act (15 U.S.C. §80b-6) –

### Against Harry Pearl, Rufus Pearl and PIMS)

57.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

58.     As set forth in the Private Placement Memorandum, PIMS acted as an investment and financial advisor to Langley with respect to investment decisions of Langley.  As further set

forth in the PPM, Harry Pearl and Rufus Pearl were the principals of PIMS as well as the managers and Board members of Langley.  Rufus Pearl and Harry Pearl had ultimate decision making authority with respect to the investments of Langley.

59.     PIMS, Rufus Pearl and Harry Pearl are therefore investment advisors as that term is defined by the Investment Advisors Act of 1940.  (15 U.S.C. §80b-2(a)(11).)

60.     PIMS, Rufus Pearl and Harry Pearl violated the anti-fraud provisions of the Investment Advisors Act (15 U.S.C. §80b-6) by making false, material misrepresentations to NutraCea with respect to the nature and quality of the investments to be made by Langley and by failing to provide all material information necessary to make their representations not misleading.  This conduct was accomplished through means of the mails and interstate commerce.  The misrepresentations made are set forth in detail in paragraphs 10-22 and 35.

61.     As a result of this conduct, NutraCea has been damaged in an amount to be proven at trial.

62.     Furthermore, as a result of the violations of the Investment Advisors Act, the agreements entered into between Langley and NutraCea are void and all consideration paid by NutraCea must be restored.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

### FIFTH CLAIM FOR RELIEF

(Rescission – Against Langley)

63.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

64.     As set forth in paragraphs 10-22, 35 and 41 above, Langley fraudulently induced NutraCea to enter into the Stock Purchase Agreement and Escrow Agreement by making material representations to NutraCea which were untrue.  Langley's conduct violates Rule 10b-5, the California Corporations Code, the Investment Advisors Act of 1940 as well as California's common law and Civil Code.

65.     Since NutraCea's consent to the transaction was procured by fraud, NutraCea is

entitled to a judgment directing the rescission of the subject transaction and the return of all consideration provided for under the agreements. Furthermore, NutraCea is entitled to rescission since the underlying agreements are void as a result of the violations of the Investment Advisors Act of 1940. NutraCea stands ready and able to return the Langley shares to Langley or its Escrow Agent as NutraCea has not sold any of those shares.

66.     As an alternate basis for rescission, NutraCea alleges that there has been a failure of consideration. NutraCea parted with stock valued at $2,380,000 with the promise and expectation of receiving readily tradable stock of an equivalent value. Instead, NutraCea received Langley stock worth only $381,607.80, 70% less than promised. Therefore, as an alternative basis for rescission, NutraCea alleges that there has been a partial or complete failure of consideration.

67.     Finally, rescission is mandatory pursuant to the terms of the agreements between the parties. Both the PPM and the Escrow Agreement provide that the transaction will be unwound and all consideration restored if Langley failed to list its stock on the London Stock Exchange by September 30, 2004. Langley failed to meet this deadline and NutraCea did not waive the deadline. Thus, rescission is mandatory under the agreements.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

### SIXTH CLAIM FOR RELIEF

(Declaratory Relief – Against Langley and Gottbetter)

68.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

69.     One of the conditions to the stock exchange was that Langley would list its stock on the London Stock Exchange by September 30, 2004 and provide notice to the Escrow Agent of that listing. Specifically, section 2(b) of the Escrow Agreement provides:

> If at any time before September 30, 2004, the Escrow Agent receives written notice (the "LSE Notice") from Langley that the Langley Consideration Shares are listed on the London Stock Exchange plc (the "London Exchange"), the Escrow Agent is authorized and directed to distribute, within fourteen (14) Business Days of receipt of such LSE Notice, (i) the Consideration Stock [the

NutraCea stock] and (ii) fifty percent (50%) of the Langley Consideration Shares [the Langley Stock] to the Target Company [NutraCea].  If the Escrow Agent does not receive such LSE Notice by September 30, 2004, the Escrow Agent is authorized and directed to distribute, no later than October 5, 2004, (i) the Consideration Stock to the Target Company and (ii) the Langley Consideration Shares to Langley; provided, however, that the Target Company shall have the option to extend the September 30, 2004 deadline by providing written notice to the Escrow Agent with a written acknowledgment from Langley.

This condition was also discussed on page 11 of the Private Placement Memorandum:

If Langley is not listed on the London Stock Exchange by September 30, 2004, the Target Company will have the option to extend the time period or to receive its Qualifying Securities from escrow and rescind the transaction.

70.     Langley's stock was not listed on the London Stock Exchange by September 30, 2004, as required by the agreements.  Thus, Langley could not have provided any notice to the Escrow Agent of such a listing.  Furthermore, NutraCea did not waive, in writing or otherwise, the condition that the stock be listed on the London Stock Exchange by September 30, 2004. Therefore, NutraCea contends that, under the agreements NutraCea is entitled to the return of the shares it deposited with the Escrow Agent.  NutraCea stands ready and willing to return to Langley, or the Escrow Agent, the Langley shares the Escrow Agent improperly distributed to NutraCea.

71.     NutraCea has made a written demand upon Langley for the rescission of the transaction due to the failure to satisfy this condition precedent.  To date, Langley has failed to restore NutraCea's shares to NutraCea as required by the agreements.

72.     A dispute thus exists between the parties with respect to the rights of the parties arising out of Langley's failure to list its stock by September 30, 2004.  NutraCea hereby seeks a declaration that Langley's failure to list its stock on the London Stock Exchange by September 30, 2004 results in the rescission or cancellation of the transaction and therefore all consideration paid must be restored.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

### SEVENTH CLAIM FOR RELIEF

(Imposition of Constructive Trust – Against Langley)

73.     NutraCea repeats and realleges each of the foregoing allegations as though set

-15-

6116646.1

forth in full herein.

74.   As alleged herein, NutraCea is entitled to the rescission of the underlying transaction.  The transaction at issue was consummated as a result of misrepresentations upon which NutraCea reasonably relied.   Furthermore, Langley has failed to satisfy conditions precedent which would have entitled Langley to the NutraCea shares.

75.   As a result of Langley's misrepresentations, Langley received 7 million shares of NutraCea which have tripled in value since the transaction date.  Langley's shares, on the other hand, were to be listed and tradeable at £1 each.  However, the initial list price, and highest trading price, was £.30.  The price has since fallen to approximately £.12.  Thus, unless the transaction is rescinded, Langley will be unjustly enriched and will receive a windfall of over $6,700,000.

76.   Based on the foregoing, NutraCea hereby prays for a judgment that Langley holds the NutraCea shares as constructive trustee for NutraCea.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

### EIGHTH CLAIM FOR RELIEF

(Preliminary and Permanent Injunctive Relief – Against Langley)

77.   NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

78.   As alleged herein, NutraCea is entitled to rescind the Stock Purchase Agreement on account of (a) fraudulent inducement, (b) violation of the Investment Advisors Act, (c) violation of federal and state securities laws, (d) failure of consideration and (e) failure of a condition in the agreements.

79.   Under the Escrow Agreement, the NutraCea stock deposited with the Escrow Agent will be freely tradeable within two years of the Closing Date.  The Stock Purchase Agreement defines the closing date as August 20, 2004, although the documents were not all signed until approximately September 9, 2004, and the actual transfer of consideration did not occur until early to mid October 2004.

-16-

80.     Unless Langley, and its agents, are enjoined from selling, hypothecating or otherwise transferring the NutraCea stock, NutraCea will be irreparably injured as NutraCea will be unable to cause a full rescission of the transaction and NutraCea's remedies of rescission and constructive trust will be frustrated.   Moreover, the value of NutraCea and its publicly traded stock will be irreparably damaged by Langley's flooding the market with the 7 million NutraCea shares if Langley is allowed to sell the stock.   This will irreparably damage NutraCea's ability to conduct business.

81.     Therefore, NutraCea seeks an order enjoining Langley, and its agents, from selling, transferring, hypothecating or otherwise transferring any interest Langley may have in the NutraCea stock delivered pursuant to the Stock Purchase Agreement and the Escrow Agreement.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

## NINTH CLAIM FOR RELIEF

(Breach of Contract – Against Langley and Gottbetter)

82.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

83.     Under section 2(b) of the Escrow Agreement, the transaction would close and the 7 million NutraCea shares were to be turned over to Langley only after Langley provided Gottbetter with written notice that Langley's stock was listed on the London Stock Exchange by September 30, 2004, unless NutraCea waived this listing requirement in writing.

84.     Langley's stock was not listed on the London Stock Exchange by September 30, 2004 as required by the agreements and therefore no notice could have been provided to Gottbetter by September 30, 2004 advising that the stock was so listed.   Furthermore, NutraCea did not waive the requirement that the stock be listed by September 30, 2004.

85.     NutraCea is informed and believes that, despite the failure of these conditions, the 7 million NutraCea shares were transferred to Langley in violation of the Escrow Agreement.   As alleged above, the failure of this condition resulted in mandatory rescission of the transaction as

6116646.1

required by the agreement.

86.     As a result of this breach, and in the event rescission cannot be now had, then NutraCea has been damaged in an amount equal to the difference in value of the stock NutraCea parted with and the stock NutraCea received plus prejudgment interest.

WHEREFORE, NutraCea prays for judgment as hereafter set forth.

## TENTH CLAIM FOR RELIEF

(Unfair Business Practices – Against Langley, Rufus Pearl and Harry Pearl)

87.     NutraCea repeats and realleges each of the foregoing allegations as though set forth in full herein.

88.     California Business and Professions Code section 17200 *et seq.* prohibits any business practices which are unfair, fraudulent or unlawful as defined by that section.

89.     The conduct of Langley and its principal and controlling agents Rufus Pearl and Harry Pearl as alleged in paragraphs 10 through 62 herein was unfair, fraudulent and/or unlawful under Business and Professions Code section 17200.

90.     As a result of that misconduct Langley has been unjustly enriched and NutraCea has been damaged as Langley fraudulently received stock of a value far in excess of that with which it parted.   Additionally, Rufus and Harry Pearl have been unjustly enriched to the detriment of NutraCea as they have earned fees to which they are not entitled.

WHEREFORE, NutraCea prays for judgment as follows:

## PRAYER

A.      On the First, Second, Third, and Fourth Claims for Relief:

(i)     For an order directing the rescission of the Stock Purchase Agreement and the Escrow Agreement and the return of all consideration exchanged pursuant to those agreements.

(ii)    If rescission cannot be had, for damages in an amount to be proven at trial equal to the difference between the promised value of Langley stock, with interest, and the price of Langley stock.

6116646.1

B.      On the Fifth Claim for Relief:  For an order directing the rescission of the Stock Purchase Agreement and the Escrow Agreement and the return of all consideration exchanged pursuant to those agreements.

C.      On the Sixth Claim for Relief:  For an judgment declaring that Langley's failure to list its stock on the London Stock Exchange by September 30, 2004 and/or to provide written notice to the Escrow Agent that its stock was listed by September 30, 2004, was a failure of a condition entitling NutraCea to rescind of the Stock Purchase Agreement and the Escrow Agreement and that the transaction is therefore rescinded.

D.      On the Seventh Claim for Relief:  For the imposition of a constructive trust over the NutraCea shares received by Langley or Gottbetter pursuant to the Stock Purchase Agreement or the Escrow Agreement.

E.      On the Eighth Claim for Relief:  For a temporary restraining order and a preliminary and permanent injunction enjoining Langley, and its agents, from selling, transferring, hypothecating or otherwise transferring any interest Langley may have in the NutraCea stock delivered pursuant to the Stock Purchase Agreement and the Escrow Agreement pending the outcome of this action.

F.      On the Ninth Claim for Relief:

(i)      For an order directing the rescission of the Stock Purchase Agreement and the Escrow Agreement and the return of all consideration exchanged pursuant to those agreements.

(ii)      If rescission cannot be had, or damages in an amount to be proven at trial equal to the difference in value between the stock NutraCea parted with and that which it received.

G.      On the Tenth Claim for Relief:  For restitution of all amounts improperly gained by the misconduct of Langley and its principals and controlling officers.

H.      On all Claims for Relief:

(i)      For punitive damages;

6116646.1

    (ii)    For recovery of costs of suit and attorneys' fees as allowed by law.

    (iii)    For such other and further relief as the Court deems just and proper.

NutraCea also demands a jury trial of all legal claims as allowed by law.

Dated: New York, New York
       October 6, 2006

                    CARTER LEDYARD & MILBURN LLP

                    By: _____
                            William H. Sloane (WS: 1301)
                            Joseph Asaro (JA: 9654)

                    2 Wall Street
                    New York, New York 10005
                    (212) 732-3200

                          and

                    WEINTRAUB GENSHLEA CHEDIAK
                    A Law Corporation
                    Dale C. Campbell
                    Peter D. Halloran
                    400 Capitol Mall, 11th Floor
                    Sacramento, CA 95814
                    (916) 558-6000

                    *Attorneys for Plaintiff NutraCea*